UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

ROBERT CENEDELLA, on behalf of himself
and a class of other similarly situated,

                       Plaintiffs,

Index No.: 18-CV-1029

-against-

METROPOLITAN MUSEUM OF ART,
WHITNEY MUSEUM OF AMERICAN ART,
MUSEUM OF MODERN ART, SOLOMON R.
GUGGENHEIM MUSEUM, and NEW
MUSEUM OF CONTEMPORARY ART,

**COMPLAINT
AND DEMAND FOR
JURY TRIAL**

                       Defendants.

---------------------------------------------------------------X

      Plaintiff ROBERT CENEDELLA, on behalf of himself and a class of others similarly situated, on personal knowledge as to the facts concerning himself and on information and belief as to all other matters, brings this class action pursuant to federal and state antitrust laws and alleges as follows:

      1.      This action arises from an unlawful conspiracy among the Defendant museums and other unnamed conspirators to deprive Plaintiff and the Class of access to the market for contemporary art in the United States and internationally; to eliminate competition with respect to the domestic and international contemporary art market; and to increase prices for certain contemporary art within the domestic and international art markets while suppressing prices for the Plaintiff and the Class. Defendants' unlawful conduct has caused injury to the Plaintiff and the Class.

2. The Defendants' unlawful collusion substantially affected interstate trade and commerce in the United States and caused antitrust injury to Plaintiff and members of the Class in the United States by depriving them of access to markets and driving up prices for contemporary art created by a limited class of artists, represented and shown by a limited class of art galleries, dealt by a limited class of art dealers, sold at auction by a limited class of auction houses, and primarily owned by interested individuals who sit on the Boards of Directors of the Defendants or who are notable patrons of the Defendants. The Defendants have created an anticompetitive closed ecosystem in which certain artists have access to the Defendants and, thereby, to the lucrative world of art dealers, auction houses, and collectors, while the Plaintiff and the Class are shut out.

3. As stated by Mr. Cenedella,

"I firmly believe it has become my duty and responsibility to expose, what I believe to be, the corporate museum cartel for the role they play in the manipulation of the overall art market. The system today – put in place by galleries, auction houses, and art critiques – has nothing to do with talent, development of skill, or maturation of the art world. I am taking extreme, legal measures -- suing the museums -- not just for myself, but for the innumerable other deserving artists as well. Contemporary art has become a Con and Temporary."

## The Parties

4. Plaintiff Robert Cenedella is a contemporary artist and resident of New York City. Cenedella has been a member of the New York City contemporary art scene for more than four decades. He studied with George Grosz at the Art Students League of New York where Cenedella now teaches. Cenedella's artwork "chronicles the everyday life and the changing rituals and mythologies – of sex, sports, art, politics, money making in contemporary America, with his combination of imaginative vitality, precision, and humor." (*George Grosz: A Biography* by M.K. Flavell). Cenedella's artwork has been the subject of one-man shows throughout the United States

and Europe. In 2016, Cenedella was the subject of the documentary film *Art Bastard*, which was long-listed for the Academy Award for Best Documentary Feature.

5. Defendant Metropolitan Museum of Art (the "Met"), located at 1000 Fifth Avenue New York, New York, was established in 1870 and is the largest art museum in the United States. The Met is one of the most visited art museums in the world. The Met was founded by businessmen, financers, and artists who had the goal of bringing art and art education to the American people. The Met's permanent collection contains works by the Old Masters, a large trove of Impressionist and Post- Impressionist art work, ancient objects, sculpture, decorative arts, and other art work throughout the 17 curatorial departments. In 2010, the Met had 5.2 million visitors.

6. The Met's permanent collection has included contemporary art since its founding. In 1987, the Met opened the Lila Acheson Wallace Wing dedicated to modern and contemporary art. The Met features several large, well-publicized exhibitions each year, including exhibitions of contemporary art and art from artists based in New York City.

7. Defendant Whitney Museum of American Art (the "Whitney"), located at 99 Gansevoort Street, New York, New York, was established in 1931 by American socialite and art patron Gertrude Vanderbilt Whitney. The Whitney's permanent collection is focused exclusively on 20th and 21st century American art with a particular emphasis the work of living artists. The Whitney's Annual Exhibitions (first shown in 1932) and Biennial Exhibitions (first shown in 1973) have featured young and less well-known artists and have brought contemporary artists such as Georgia O'Keefe, Jackson Pollock, Jeff Koons to national and international prominence. In 2013, the Whitney had 350,000 visitors.

8. Defendant Museum of Modern Art (the "MoMA"), located 11 West 53rd street New York, New York, was established in 1929 and is one of the largest and most influential modern art museums in the world. The MoMA permanent collection contains many modern Western masterpieces, as well as a wide range of art work, sculpture, film, and objects from influential European and American modern artists. In 2000, MoMA affiliated itself with MoMA P.S. 1, a contemporary art museum in Queens that features emerging art, including innovative and experimental exhibitions, installations, and events. In 2013, MoMA attracted 3.1 million visitors.

9. Defendant Solomon R. Guggenheim Museum (the "Guggenheim"), located at 1071 Fifth Avenue, New York, New York, was established in 1937. The Guggenheim contains a collection of Impressionist, Post-Impressionist, modern, and contemporary art from several important private collections. The Guggenheim's iconic cylindrical building, designed by the architect Frank Lloyd Wright, is a landmark work of art and in of itself. It features a unique ramp gallery that spirals along the outer edge of the building. The Guggenheim regularly hosts large exhibitions and, in 2013, drew nearly 1.2 million visitors.

10. Defendant New Museum of Contemporary Art (the "New Museum"), located 235 Bowery, New York, New York, was established in 1977. The New Museum is dedicated to presenting contemporary art from around the world. The New Museum permanent collection contains approximately 1,000 works in many media. The New Museum focuses on exhibiting emerging and unrecognized artist, as well as important figures yet to reach widespread public recognition.

## Factual Allegations

11. The inclusion of an artist's work in the permanent collection of an art museum such as the Met, Whitney, MoMA, Guggenheim, or New Museum (collectively, the "Defendants") is a

4

career-changing event for an artist. Even more career-changing is a solo exhibition of that artist's work, or the inclusion of the artist's work in a featured exhibition.

Inclusion in the Defendants' Permanent Collection

12. The Defendants, like fine art museums around the world, have varying acquisition policies, none of which are publicly disclosed. Private collectors, galleries, and auction houses play an outsized role in determining what works of art end up in the Defendants' permanent collections.

13. The Defendants typically rely on gifts from private collectors to build their permanent collections. Private collectors donate 80 to 90 percent of what is on view in American art museums.[1]

14. In addition, galleries provide the Defendants with exclusive and discounted access to certain work. Large museums often purchase art at a 30% discount for inclusion in their permanent collections, which inures to the benefit of the artists represented by those galleries offering the discount.[2]

15. Auction houses are motivated, in terms of finances and publicity, to create high and noteworthy resales of contemporary art. These inflated sale prices are then used by museums for insurance valuations and by art dealers, who adjust prices to conform with the latest sales figures.[3]

16. Galleries feed into this ecosystem by manipulating the secondary market for their artists' work when it goes for sale at auction. When an artist's work goes to auction, galleries often

---

[1] Judith H. Dobrzynski, "How an Acquisition Fund Burnishes Reputations," *New York Times*, March 15, 2012, at F4.
[2] Allison Schrager, "High-End Art is One of the Most Manipulated Markets in the World," *Quartz*, July 11, 2013.
[3] Alice G. Marquis, *The Art Biz: The Covert World of Collectors, Dealers, Auction Houses, Museums, and Critics*, 1991.

5

send people to bid and drive prices higher. They also maintain prices by threatening to cut purchasers off from future purchases if they resell art.[4]

17. In this closed system of museums, auction houses, and galleries, prices for contemporary art by a select few artists are driven up; prices are maintained at artificially high levels; and art is acquired by museums, solidifying the profitability of the artwork and the artist. Only those artists who are represented by influential galleries are able to enter this system, which is closed to all other contemporary artists whose work is not considered to be acquired by the Defendants because they do not carry the imprimatur or financial cache of the contemporary artists within the closed system.

A Solo Exhibition or Featured Place in an Exhibition

18. A museum exhibition (whether a solo show, retrospective, or inclusion in a group show) can increase the value of an artist's work by as much as 80% and bring awareness to an artist's work that would not otherwise exist. There is a direct relationship between value and exhibition, and museums such as the Defendants bring the highest level of exhibition prestige for an artist.[5]

19. When an artist's work is featured in an upcoming exhibition at one of the Defendants, prices for their art undoubtedly rises. For example, the average selling price for a Mark Grotjahn painting rose from $322,000 to $1.2 million in 2015 due in part to an exhibition featuring his work at The MoMA in 2014.[6]

---

[4] Schrager, *supra*.
[5] Paul Sullivan, "A Museum's Seal of Approval Can Add to Art's Value," *New York Times*, October 14, 2016, at B5.
[6] Robin Pogrebin, "Art Galleries Face Pressure to Fund Museum Shows," *New York Times*, March 7, 2016.

20. Determining what art and artists are featured in exhibitions is up to the Defendants' and their curator's opaque artistic standards, but they are heavily influenced by collectors, galleries, art dealers, auction houses, and well-connected collectors.

21. An investigation by Julia Halperin of the Art Newspaper shows that "almost one-third of solo museum exhibitions in the United States are of artists represented by one of five prominent commercial galleries: Gagosian Gallery, Marian Goodman, Pace, David Zwirner and Hauser & Wirth."[7] To put that in context, in 2015 there were 1,425 art galleries in New York City alone.[8]

22. Out of all major solo exhibitions at Defendant Guggenheim between 2007 and 2013, 90% of those exhibitions featured artists represented by the same five galleries. Forty-five percent of single-artist shows at the MoMA featured artists from the same five galleries. And forty percent of major shows at the New Museum featured artists from the same five galleries. All told, museums in New York were 75% more likely to devote a solo show to these artists, and the rate of shows from these galleries increased during the years after the 2007 financial crisis.[9]

23. The pervasiveness of solo exhibits featuring artists from a select few galleries is a result of financial support, logistical support, and other incentives provided by galleries. In the run-up to a major solo show, galleries often provide curators with access to archival images, pay shipping costs, pre-order hundreds of catalogues, and help finance the opening reception.[10]

24. In other situations, dealers or art galleries will finance shows directly. Galleries are routinely asked by museums to support museum shows in amounts ranging from $5,000 to

---

[7] Carolina A. Miranda, "About One-Third of Solo Museum Shows in U.S. Are By Artists From 5 Galleries," *Los Angeles Times*, April 3, 2015.
[8] Peter D'Amato, "You Gotta Have Art," *Crain's New York Business*, September 7, 2015.
[9] Julia Halperin, "Almost One Third of Solo Shows in US Museums Go to Artists Represented by Five Galleries," *The Art Newspaper*, April 2, 2015.
[10] Ibid.

7

$50,000. The gallery payments, which museums tailor toward a dealer's financial capability, are directed toward expenses like opening-night dinners, catalogs, shipping, and costs associated with an artist's creation of new work for the show.

25. At the Guggenheim, galleries are typically part of the museum's Leadership Committee that includes collectors, foundations, and businesses whose support goes directly toward the costs of presenting an exhibition.[11]

26. For the Frank Stella retrospective at the Whitney in 2015, the installation of two outdoor sculptures was made possible in part by two galleries that jointly represent the artist.[12]

27. Prominent galleries' close collaboration with museums such as the Defendants results in increased prices for their artists' work. During the period between when a show is green-lit and the official announcement, galleries call their top collectors to let them in on the deal. During this time, wealthy art collectors are granted exclusive access to purchase the artists' work as prices are primed to rise.

28. The museums such as the Defendants also engage in pre-exhibition speculation of the artists represented by the galleries. Museum curators encourage members of the Board of Directors, who are often notable art collectors, to buy pieces by artists that a museum is planning to show or acquire, hoping that the museum will receive that work by donation later on. By the time the exhibition is officially announced, there is little primary market work available and prices are already going up.[13]

29. This closed system of the Defendant museums, the five galleries, artists, and prominent art collectors operates to the financial benefit of all participants. By that same token,

---

[11] Robin Pogrebin, "Art Galleries Face Pressure to Fund Museum Shows," *New York Times*, March 7, 2016.
[12] Ibid.
[13] Marc Spiegler, "The Art Trade is the Last Unregulated Market," *The Art Newspaper.com*, September 21, 2005.

8

artists outside of this system are foreclosed from the financial benefits of having their art exhibited by the Museums, do not benefit from any of the promotion and profitability garnered by the galleries, and do not see the financial success that comes with increased prices and sales of their art by prominent collectors.

Plaintiff Robert Cenedella

30. Plaintiff is a working contemporary artist based in New York City. He has produced contemporary art for commercial sale in New York City and throughout the United States.

31. Plaintiff's artwork is of the quality that otherwise would be show in a major contemporary art museum, but for the illegal conspiracy of the Defendants.

32. Despite the artistic merit and public acclaim associated with Plaintiff's contemporary art, Plaintiff's contemporary art has not been purchased by the for inclusion in their permanent collections. The Defendants have furthermore failed to feature Plaintiff's contemporary art in group or solo exhibitions.

33. As a result of the Defendants' conspiracy, Plaintiff has been unable to sell or set adequate prices for his artwork in the same manner as contemporary artists whose work is purchased and/or exhibited by the Defendants.

**Venue and Jurisdiction**

34. Plaintiff brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, for damages, as well as injunctive and other equitable relief, against Defendants for violating Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff also seeks compensatory and punitive damages, restitution, and other relief under state antitrust laws. Plaintiff and the Class also seek attorneys' fees, costs, and other expenses under federal and state law.

35. This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 26, 15 U.S.C. § 1, and 28 U.S.C. §§ 1331 and 1337, as well as jurisdiction over state law claims pursuant to 28 U.S.C. §§ 1332(d) and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from the Defendants.

36. Venue is proper in this District pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c), and (d), because one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, or are found or transaction business in this District, a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the affected interstate trade and commerce (discussed below) has been carried out in this District.

37. This Court has personal jurisdiction over the Defendants because each, either directly or indirectly, (a) transacted business in the United States, including in this District; (b) had substantial aggregate contacts with the United States, including in this District; or (c) were engaged in an illegal conspiracy in restraint of trade that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

38. Defendants' unlawful conduct substantially affected commerce throughout the United States, causing injury to the Plaintiff and the Class. Defendants, directly and through their agents, engaged in anticompetitive activities affecting all states, through coordinated activities.

Each Defendant acted as the principal of or agent for the other Defendants with respect to the alleged common course of conduct, actions, and legal violations.

## Class Act Allegations

39. Plaintiff brings this action on behalf of himself and as representative of a class under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure seeking equitable and injunctive relief on behalf of the nationwide class of contemporary artists who, during the applicable period, have crated artwork eligible for exhibition in major contemporary art museums in the United States (the "Class").

40. Plaintiff does not know the exact number of members in the Class but believes there are (at least) dozens of members of the Class.

41. Common questions of law and fact exist as to all members of the Class. Defendants' conspiracy was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. The questions of law and fact common to the Class includes:

(a) whether the Defendants and their co-conspirators engaged in a combination and conspiracy to restrain competition and artificially inflate the price of, and otherwise eliminate or restrain competition concerning contemporary art in the United States;

(b) the identity of the conspirators;

(c) the duration of the conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d) whether the conspiracy violated the Sherman Act;

(e) whether the alleged conspiracy violated state antitrust laws;

11

(f) whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the members of the Class, entitling Plaintiff and the Class to disgorgement of benefits derived by Defendants;

(g) whether the conduct of the conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class;

(h) the effect of the conspiracy on the prices of contemporary art sold in the United States during the Class Period;

(i) whether Plaintiff and the members of the class had any reason to know or suspect the conspiracy, or any means to discover the conspiracy;

(j) whether the conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the members of the Class;

(k) the appropriate injunctive and related equitable relief for the Class; and,

(l) the appropriate class-wide measure of damages for the Class.

42.     Plaintiff's claims are typical of the claims of the members of the Class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Class are similarly affected by the Defendants' wrongful conduct in that they were blackballed from the contemporary art market and suffered an artificial depression in prices for their artwork as a result.

43.     Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel competent and experience in the prosecution of antitrust and class action litigation.

44. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

45. Class action treatment is a superior method for the fair and efficient adjudication of this controversy. Among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the necessary duplication of evidence, effort, and expense of numerous individual actions. The benefits of proceeding as a class, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any potential difficulties in managing this class action.

46. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

## Causes of Action

### Count One

**Violation of § 1 of the Sherman Act and New York Donnelly Act against all Defendants (Robert Cendella, individually and on behalf of all others similarly situated.)**

47. Plaintiff repeats and realleges allegations set forth in Paragraphs 1 through 45 as if set forth herein.

48. Defendants and their co-conspirators entered into and have and are engaged in a continuing contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

49. The acts done by the Defendants as part of, and in furtherance of, their and their co-conspirators' contract, combination, or conspiracy were authorized, ordered, or done by their

officers, agents, employees, or representatives while actively engaged in the management of their affairs.

50. During the applicable period, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, and control prices for contemporary art in the United States and to blackball some producers of contemporary art, thereby creating anticompetitive effects.

51. The anticompetitive acts were intentionally directed at the United States market for contemporary art, and had a direct, substantial, and foreseeable effect on interstate commerce by artificially raising prices for some contemporary art throughout the United States and blocking some contemporary art from access to the market in the United States.

52. The conspiratorial acts and combinations have caused unreasonable restraints in the market for contemporary art in the United States.

53. As a result of Defendants' unlawful conduct, Plaintiff and members of the Class have been harmed by the artificial depression in the price of their artwork and/or by their exclusion from the contemporary art market altogether.

54. In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants and their co-conspirators did the acts, practices, and course of conduct alleged in this Complaint, as well as other acts and conduct they agreed to.

55. Defendants' conspiracy had the following effects, among others:

(a) Price competition in the market for contemporary art has been restrained, suppressed, and/or eliminated in the United States;

(b) Prices for contemporary art have been fixed, raised, maintained, and/or stabilized at non-competitive levels throughout the United States; and

(c) Plaintiff and members of the Class have been deprived of the benefits of free and open competition and access to the market for contemporary art.

56. Plaintiff and member so the Class has been injured and will continue to be injured in their business and property.

57. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

58. Plaintiff and the members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## Count Two

### Violation of State Antitrust Statutes against all Defendants
### (Robert Cendella, individually and on behalf of all others similarly situated.)

59. Plaintiff repeats and realleges allegations set forth in Paragraphs 1 through 57 as if set forth herein.

60. During the applicable period, Defendants and their co-conspirators have and are engaged in a continuing contract, combination, or conspiracy with respect to the contemporary art market in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below.

61. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, and/or maintain the prices for contemporary art in the United States.

62. In formulating and effectuating this conspiracy, the Defendants and their co-conspirators acted in furtherance of the combination and conspiracy, including, upon information and belief, participating in meetings and conversations among themselves in the United States and elsewhere, during which they agreed to fix, raise, inflate, stabilize, and/or maintain at artificial

levels prices for contemporary art, and to restrict access to the market for contemporary art, among other anti-competitive effects.

63. Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, raise, inflate, stabilize, and/or maintain at artificial levels prices for contemporary art, and to restrict access to the market for contemporary art in the United States, among other unlawful and anti-competitive ends.

64. Defendants' anticompetitive acts described above were knowing and willful and constitute violations and/or flagrant violations of New York General Business Law §§ 340, *et seq.*

65. Defendants' combination or conspiracy has the following effects: (1) contemporary art price and other competition was restrained, suppressed, and eliminated throughout New York; (2) contemporary art prices were raised, fixed, maintained, and stabilized at artificially high prices throughout New York, in addition to other anti-competitive effects; and, (3) Plaintiff and members of the Class were deprived of free and open competition.

66. During the applicable period, Defendants' illegal conduct substantially affected New York commerce.

67. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other members of the Class have been injured in their business and property and are threatened with further injury.

68. By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the New York Donnelly Act, §§ 340, *et seq.* The conduct set forth above is a *per se* violation of the Act. Accordingly, Plaintiff and members of the Class seek all relief available under New York Gen. Bus. Law §§ 340, *et seq.*

### Prayer for Relief

Accordingly, Plaintiff respectfully requests that:

69. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

70. That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

    (a) An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

    (b) A *per se* violation of Section 1 of the Sherman Act; and,

    (c) An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws as set forth herein.

71. Plaintiff and the members of the Class recover damages, to the maximum extent allowed under such laws but not less than $100,000,000 against the Defendants, and that a joint and several judgment in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

72. Plaintiff and the members of the Class recover damages, to the maximum extent allowed by such laws but not less than $100,000,000 against the Defendants, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

73. Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering

into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having the similar purpose or effect;

74. Plaintiff and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate and after the date of service of this Complaint;

75. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and,

76. Plaintiff and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

### Jury Demand

Plaintiff demands, for himself and the Class, a trial by jury pursuant to the Federal Rules of Civil Procedure of all issues so triable.

HANTMAN & ASSOCIATES

By: *Robert J. Hantman* (signature)
Robert J. Hantman
1120 Avenue of the Americas, 4th Floor
New York, New York 10036
(212) 684-3933
www.hantmanlaw.com