USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _12-19-18_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

ROBERT CENEDELLA,

                         Plaintiff,

        – against –                           18 Civ. 1029 (JGK)

METROPOLITAN MUSEUM OF ART, ET AL.,           OPINION AND ORDER

                         Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

     The plaintiff, artist Robert Cenedella, brings this

antitrust action against the defendants, five New York City

museums,[1] on behalf of himself and a nationwide class of artists

similarly situated. The plaintiff alleges violations of § 1 of

the Sherman Act, 15 U.S.C. § 1, and the New York Donnelly Act,

N.Y. Gen. Bus. Law § 340 et seq. The defendants have moved to

dismiss the plaintiff's amended complaint under Federal Rule of

Civil Procedure 12(b)(1) for a lack of standing, and Rule

12(b)(6) for failure to state a claim upon which relief can be

granted. For the reasons that follow, the defendants' motion to

dismiss is **granted,** and the plaintiff's amended complaint is

dismissed **without prejudice.**

---

[1] The defendants are the Metropolitan Museum of Art, the Whitney Museum
of American Art, the Museum of Modern Art, the Solomon R. Guggenheim
Foundation, and the New Museum of Contemporary Art.

I.

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing

suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

## II.

### A.

The plaintiff is a contemporary artist and New York City resident. Amended Compl. ¶ 5. His artwork "has been the subject of one-man shows throughout the United States and Europe," and he was the subject of a 2016 art documentary film. Id. ¶ 7. This documentary portrayed the plaintiff "as a rebel, the anti-Andy Warhol, and an unabashed art world outsider." Opp'n at 1.

The plaintiff brings this action on behalf of himself and a nationwide class consisting of "at least dozens" of contemporary artists who, during an undefined class period, have created artwork "eligible for exhibition in major contemporary art museums in the United States." Amended Compl. ¶¶ 54–55. The plaintiff alleges that New York City is the relevant market for purposes of his antitrust action, noting that the city is commonly known to be the most influential contemporary art city in the United States, and that the city houses more than 1,000 galleries, seventy-five museums, and thirty art fairs. Id. ¶¶ 47–48.

The defendants, according to the plaintiff, are part of the "highest echelon[] of the New York City art world" and are among the most prominent and influential art institutions internationally. Opp'n at 1-2. The plaintiff alleges that the defendants entered into a conspiracy, which included "other unnamed conspirators," to "artificially fix, raise, and control prices for contemporary art in the United States and to blackball some producers of contemporary art." Amended Compl. ¶¶ 1-2, 65. The unnamed conspirators include galleries, auction houses, and private collectors. See id. ¶¶ 20, 22. This conspiracy has allegedly kept the plaintiff's art out of the five defendant museums, even though his art "is of the quality that would otherwise be show[n] in" the defendant museums. Id. ¶¶ 44-45. This conspiracy has also allegedly resulted in the plaintiff's artwork being artificially undervalued. Id. ¶ 46.

As museums, the defendants are prominent art purchasers that routinely expend tens of millions of dollars on contemporary art pieces at auctions or through private purchases. Id. ¶ 15. Numerous pieces of art are also donated to the defendants by private collectors. Id. ¶ 19. The defendants have acquisition policies that they follow in acquiring art. Id. ¶ 16. These policies are not comprehensively disclosed to the public, but the defendants' general curatorial policies are available on their websites. Id.; Opp'n at 2. When an artist's

work is displayed in one of the defendant museums, the value of that work increases. Amended Compl. ¶¶ 25-26.

Between the years 2007 and 2013, nearly one-third of solo museum exhibits across the United States featured artists represented by one of five commercial galleries (the "Five Galleries"). Id. ¶ 28; Cavanaugh Decl. Ex. 1 at 2. During these years, artists represented by the Five galleries accounted for 45 percent of "single-artist shows" at the Museum of Modern Art, 40 percent of "major shows" at the New Museum, and 90 percent (eleven out of twelve) of the "major solo exhibitions" at the Guggenheim. Amended Compl. ¶ 30; Cavanaugh Decl. Ex. 1 at 1-2.[2] Moreover, "[a] select few galleries" provide financial, logistical, and other support to the defendants in putting on exhibitions. Amended Compl. ¶ 32. And galleries are frequently part of the leadership committee of one of the defendant museums. Id. ¶¶ 33-34. The plaintiff's amended complaint does not specify whether the Five Galleries are part of the "select few galleries" providing support to the defendants or whether any of the Five Galleries are part of a defendant's leadership committee.

---

[2] The article the plaintiff cites for the 90-percent figure notes that, when smaller Guggenheim shows are taken into account, about 55 percent of the museum's solo exhibitions featured artists from the Five Galleries. Cavanaugh Decl. Ex. 1 at 2.

**B.**

The plaintiff alleges that features of this art ecosystem —
the defendants not fully disclosing their acquisition policies,
the rise in a work's value once displayed in the defendant
museums, the Five Galleries providing many of the defendant
museums' exhibitions, and galleries supporting the defendants
generally — indicate a conspiracy, and have anticompetitive
effects harmful to him and other artists. Specifically, the
plaintiff alleges that the defendants purchase and exhibit
primarily the work of artists represented by the Five Galleries,
which, given the prestige of the defendant museums, drives up
the prices of works by those artists. See id. ¶¶ 25-30. The
value and desirability of these select artists' works continue
to rise as the defendants continue purchasing and exhibiting
these same artists' works. See id. This, according to the
plaintiff, appeases the Five Galleries, which become more
willing to support the defendants, and further benefits the
defendants by making their collections more valuable and
exhibitions more popular. See id. ¶¶ 31-34, 37-38.

The plaintiff also claims that the defendants encourage
private collectors to buy pieces by these select artists, and
then the defendant museums display the pieces to make them more
valuable in hopes that the collectors will later donate the
pieces to the defendants. Id. ¶ 36. Moreover, the plaintiff

alleges that auction houses contribute to the conspiracy by selling the works of these select artists to museums at artificially high prices, thus keeping the art market artificially overpriced. Id. ¶ 20.

In short, the defendants allegedly agreed to use their clout in the art world to make certain artists' works increasingly valuable, and then to continue to draw upon those same artists to the defendants' collective benefit. To carry out this alleged scheme, the defendants coordinate with various galleries, auction houses, and private collectors who are in on the conspiracy. The plaintiff adds that the defendants hide their scheme by not disclosing their acquisition policies comprehensively; if the defendants fully disclosed their policies, the plaintiff claims, the defendants would have to draw upon a more diverse array of artists to appear in compliance with their policies. See id. ¶¶ 16-18.

The plaintiff claims that the defendants' alleged conspiracy shuts him and others out from the New York City contemporary art market. Id. ¶ 68. The plaintiff alleges that, as a result, he and other artists whose works are not purchased by, or displayed in, the defendant museums suffer harm in the form of "artificial depression" in the prices of their works. Id. ¶¶ 57, 68. Put another way, if not for the alleged conspiracy, the museums would purchase the artwork of the

plaintiff and others, and consequently the plaintiff and others would see a rise in the value of their artwork. The plaintiff also alleges that the price of contemporary art has been fixed throughout the United States, and price competition in the contemporary art market restrained, as a result of the defendants' conspiracy. Id. ¶ 70. Finally, the plaintiff claims that the defendants' conspiracy is a per se violation of the Sherman Act, and he requests damages of not less than $100 million. Id. ¶ 72, Prayer for Relief ¶ 3.

The defendants have moved to dismiss the amended complaint on several grounds, including failure to allege facts sufficient to demonstrate: Article III standing, antitrust standing, a conspiratorial agreement among the defendants, a relevant geographic market, and an adverse effect on competition stemming from the defendants' alleged conspiracy. The defendants request that the plaintiff's amended complaint be dismissed with prejudice. If the Court is inclined to dismiss the amended complaint, the plaintiff asks for another opportunity to attempt to plead a viable claim. For the reasons that follow, the defendants' motion to dismiss is **granted**, and the plaintiff's amended complaint is dismissed **without prejudice.**

### III.

### A.

The defendants first argue that the plaintiff lacks constitutional standing to bring this suit. Article III of the Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992). To satisfy the requirements of Article III standing, a plaintiff must show that (1) he has suffered an actual or imminent injury in fact, which is an invasion of a legally protected interest that is concrete and particularized; (2) there is a causal connection between the injury and defendant's actions; and (3) it is likely that a favorable decision in the case will redress the injury. Id. at 560-61. "The party invoking federal jurisdiction bears the burden of establishing these elements." Id. at 561; see Springer v. U.S. Bank Nat'l Ass'n, No. 15cv1107, 2015 WL 9462083, at *3 (S.D.N.Y. Dec. 23, 2015).

In this case, the plaintiff alleges that the defendants have injured him by conspiring in a way that shuts him out of the New York City contemporary art market and artificially depresses the value of his artwork as a result. The plaintiff claims that but for the alleged conspiracy, the defendants would purchase and display his artwork, thus raising the value of his work to the price he believes it deserves. However, the

plaintiff has not pleaded facts indicating that a favorable decision would be likely to redress this injury.

If the defendants' alleged conspiracy were enjoined, it is mere speculation that the defendants would begin purchasing the plaintiff's work. "[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan, 504 U.S. at 561 (quotation marks omitted). Which artists' works the defendants purchase is up to the defendants' discretion. Although the plaintiff assures the Court that his artwork is of a quality that would be shown in the defendant museums if not for the alleged conspiracy, this subjective boast alone cannot substantiate the plaintiff's claim that enjoining the alleged conspiracy would lead the defendants to begin purchasing his work. Cf. Rangel v. Boehner, 20 F. Supp. 3d 148, 161 (D.D.C. 2013) (holding that a plaintiff lacks standing where redress "depends entirely on the unbridled discretion" of another), aff'd, 785 F.3d 19 (D.C. Cir. 2015). Indeed, the plaintiff does not allege that other museums show his artwork; he states only that his work has been the subject of one-man shows throughout the United States and Europe.

Because the plaintiff has not pleaded facts indicating that a favorable decision would likely redress his alleged injury, he lacks Article III standing. For this reason, the amended complaint must be dismissed.

**B.**

The defendants also contend that the plaintiff lacks antitrust standing to bring this suit. In addition to constitutional standing, "[a]n antitrust plaintiff must show . . . antitrust standing at the pleading stage. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157 (2d Cir. 2016) (quotation marks omitted). To meet the antitrust standing requirement, the plaintiff must allege plausibly (1) that he suffered an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," and (2) that he is an "efficient enforcer" of the antitrust laws. Id. (quotation marks omitted). The plaintiff has met his burden of alleging the former requirement but not the latter.

**1.**

A three-step process guides the Court in determining whether the plaintiff alleged an antitrust injury. First, the plaintiff must identify the anticompetitive process of which he complains. Harry v. Total Gas & Power N. Am., Inc., 244 F. Supp. 3d 402, 419 (S.D.N.Y. 2017), aff'd as modified, 889 F.3d 104 (2d Cir. 2018). Next, the Court must identify the actual injury

alleged by the plaintiff. Id. Finally, the Court must "compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges in order to determine whether the injury alleged is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful." Id. (quotation marks omitted).

In this case, the plaintiff identifies the conspiracy described above as the anticompetitive process relevant to his suit. And the Court identifies the actual injury alleged by the plaintiff as his and others' being shut out of the defendant museums — and so the New York City contemporary art market — and suffering "artificial depression" in the value of their artwork as a result. This, according to the plaintiff, deprives artists of the benefit of free and open competition in the New York City contemporary art market.

The defendants insist that the third step of the inquiry, comparing the alleged anticompetitive effect of the conspiracy — the artificial increase in price for some artists' works — with the plaintiff's alleged injury — artificial depression in the prices of his works and those of others — shows the plaintiff's failure to allege an antitrust injury. According to the defendants, the plaintiff seeks to join the closed art ecosystem allegedly created by the defendants and command the super-

competitive profits enjoyed by artists in the ecosystem. This, the defendants argue, is not an antitrust injury. Rather, they argue, the plaintiff is complaining that he has failed to enjoy the fruits of the alleged conspiracy. The defendants rely primarily on Daniel v. American Board of Emergency Medicine, in which the Second Circuit Court of Appeals held that the plaintiffs' alleged injury of being unable to obtain the super-competitive pay commanded by doctors holding a certain credential was not an antitrust injury. 428 F.3d 408, 438-41 (2d Cir. 2005); see also Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) ("The claim that a practice reduces (particular) producers' incomes has nothing to do with the antitrust laws, which are designed to drive producers' prices down rather than up.").

However, here the plaintiff does not define his injury as being unable to enjoy the benefits of the closed ecosystem effectuated by the alleged conspiracy. Rather, he claims that, as an outsider, his work is devalued. The inflated prices of artwork inside the ecosystem, and the defendants' power to proclaim what is "good art" deserving of high value, allegedly precludes his artwork from reaching the value he believes it merits - not necessarily super-competitive value, but rightful value. If the conspiracy were enjoined, the plaintiff argues,

13

his work would be displayed at the defendant museums and accordingly be more valuable.

This theory differs from that of the plaintiffs in Daniel, where the plaintiffs' "singular complaint was that they were denied the opportunity to command the same super-competitive pay earned by their [credentialed] colleagues." 428 F.3d at 439. Moreover, the Daniel plaintiffs, unlike the plaintiff here, sought in their prayer for relief not to end the complained-of credentialing arrangement but rather to join in it. Id. at 440.

The plaintiff in this case alleges that a conspiracy precludes him and others from competing in the New York City contemporary art market, thus hindering their ability to sell their artwork at a fair price and depriving them of the benefits of open competition. He claims that his injury is indicative of this. Although the plaintiff's injury is highly speculative, it cannot be said at this stage that the plaintiff's injury is not of the type that the antitrust laws were intended to prevent and that it does not flow from that which makes the alleged conspiracy illegal.

2.

However, the plaintiff has failed to allege adequately that he is an "efficient enforcer" of the antitrust laws. Courts consider four factors in determining whether an individual antitrust plaintiff is fit to bring suit:

14

(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries.

In re Aluminum Warehousing Antitrust Litig., 95 F. Supp. 3d 419, 441 (S.D.N.Y. 2015). Each factor weighs against the plaintiff. The plaintiff hardly argues otherwise, only stating summarily in his opposition brief that "at this stage of pleading, Plaintiff has made sufficient allegations under this [efficient-enforcer] analysis to permit this Court to conclude that Plaintiff has antitrust standing because of the direct connection between the Defendants' conspiracy and Plaintiff's injury." Opp'n at 11.

First, the plaintiff's asserted injury is indirect: favorable treatment and artificial inflation for some artists' works, according to the plaintiff, results in diminution of his artworks' value. This theory of harm depends upon the tenuous inference that five museums effectively control the value of not just the art that they purchase and display but the value of all contemporary artwork in New York City. Possible plaintiffs with more direct claims would include purchasers or other museums outside of the alleged conspiracy who buy art at the alleged artificially inflated prices.

Second, there exist other possible plaintiffs who, if the conspiracy causes the effects claimed, would be typically motivated to vindicate the public interest in antitrust enforcement - namely, the purchasers and museums outside of the alleged conspiracy who pay the inflated prices. See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 542 n.47 (1983) ("[I]f there is substance to the [plaintiff's] claim, it is difficult to understand why these direct victims of the conspiracy have not asserted any claim in their own right.").

Third, the plaintiff's alleged injury is highly speculative. The plaintiff assumes that if the alleged conspiracy did not exist, his work would appear in the defendant museums and become more valuable. This theory depends entirely upon the discretion and subjective tastes of the defendants. Other than vague statements that his work is of a quality worthy of display in the defendant museums and has been the subject of shows in the United States and Europe, the plaintiff provides no reason to infer that the defendant museums would in fact purchase and display his art but for the alleged conspiracy. The plaintiff does not allege, for example, that his artwork has been shown in museums similar to the defendant museums.

Finally, the plaintiff's alleged damages are also highly speculative, and therefore difficult to identify and apportion.

Although his complaint presents some figures illustrating how much artwork increases in value after being displayed at the defendant museums, he provides no figures related to the undervaluing of his own work. Moreover, determining how much of the alleged artificial undervaluing of the plaintiff's artwork is attributable to the defendants, and how much to other factors – such as the public taste, the interest of other purchasers, and the opinions of critics and academics – calls for extensive speculation. And insofar as the plaintiff's damages consist of lost profits from his being shut out of the defendant museums, it is impossible to estimate the extent to which the plaintiff would have, but for the conspiracy, been accepted into the defendant museums, and how much he would have profited as a result. Whether a piece of the plaintiff's artwork would have been purchased by one of the defendants rather than, for example, a Warhol production, would depend entirely on the subjective views of a defendant museum's staff. The difficulty in identifying and apportioning damages is amplified by the prospect of applying the plaintiff's attenuated damages theory to a "nationwide class" consisting of "at least dozens" of contemporary artists who, during an undefined period, created artwork "eligible for exhibition in major contemporary art museums in the United States." Amended Compl. ¶¶ 54–55.

In sum, the plaintiff is not an efficient enforcer of the antitrust laws. Therefore, he lacks antitrust standing to bring this suit.

### C.

Third, the defendants argue that the plaintiff has failed to allege adequately an agreement among the defendants in violation of the antitrust laws. "Section 1 of the Sherman Act bans restraints on trade 'effected by a contract, combination, or conspiracy.'" United States v. Apple, Inc., 791 F.3d 290, 314 (2d Cir. 2015) (quoting Twombly, 550 U.S. at 553). Thus, the plaintiff must prove that the challenged conduct stems from a tacit or express agreement among the defendants, not from independent decisions of the defendants. Id. at 314-15. The plaintiff may prove such an agreement through "direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984) (quotation marks omitted).

At the motion to dismiss stage, an allegation of parallel conduct among defendants, even consciously undertaken, does not itself sufficiently prove an agreement among the defendants for purposes of § 1 of the Sherman Act. Twombly, 550 U.S. at 556-57. Nor does "a conclusory allegation of agreement at some

unidentified point" supply facts adequate to show a plausible
Sherman Act violation. Id. at 557. Where, as here, the plaintiff
does not allege direct evidence of an agreement among the
defendants, the plaintiff must present circumstantial facts —
"plus factors" — to support the inference that a conspiratorial
agreement took place. Mayor & City Council of Balt. v.
Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013). Contrary to
the plaintiff's contention otherwise, which relies on pre-
Twombly cases, plus factors are appropriately considered at the
motion to dismiss stage of a case. See id.; see also Twombly,
550 U.S. at 557 ("An allegation of parallel conduct is thus much
like a naked assertion of conspiracy in a § 1 complaint: it gets
the complaint close to stating a claim, but without some further
factual enhancement it stops short of the line between
possibility and plausibility of entitlement to relief."
(alteration accepted and quotation marks omitted)). Finally, a
plaintiff's complaint can be dismissed where there is an obvious
alternative explanation to the facts underlying the alleged
conspiracy among the defendants. Abbott Labs. v. Adelphia Supply
USA, No. 15cv5826, 2017 WL 5992355, at *10 (E.D.N.Y. Aug. 10,
2017) (citing Twombly, 550 U.S. at 567).

    In this case, the plaintiff summarily asserts several times
that there is an agreement amongst the defendants and other co-
conspirators — namely, the Five Galleries. See, e.g., Amended

Compl. ¶¶ 29, 31, 65, 76. But the plaintiff's amended complaint provides nothing more than conclusory allegations. The plaintiff does not allege during what time period the conspiracy was formed, or who among the defendants' employees created the conspiracy. Nor does the plaintiff clarify the extent to which the conspiracy is horizontal versus vertical – that is, among the defendants themselves rather than among the defendants and actors at different levels of the market such as galleries, auction houses, and collectors. The amended complaint focuses primarily on alleged agreements between the defendants and the Five Galleries, and leaves it to the Court to assume that the defendants also entered into a horizontal agreement. See id. ¶¶ 29, 31. Additionally, the plaintiff adds that other unnamed co-conspirators, whom the plaintiff makes little effort to describe, are part of the conspiracy. See id. ¶¶ 1, 31. In short, the plaintiff's amended complaint is completely devoid of facts indicating who agreed with whom, to what, and when.

Moreover, the plaintiff's amended complaint lacks facts indicating the existence of plus factors. Plus factors include "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Mayor & City Council of Balt., 709 F.3d at 136 (quotation marks omitted). The plaintiff

does not allege facts bearing on these factors. Rather, the plaintiff broadly alleges that the benefit purportedly received by the defendants proves the existence of an agreement to conspire in the first instance. See Amended Compl. ¶¶ 31-37. But it is not apparent that the defendant museums actually benefit by driving up the price of artwork that they purchase even if their collections increase in value. The plaintiff also alleges that the defendants draw heavily upon the Five Galleries, and that indicates an explicit agreement among them all. Id. ¶ 29. But that is a wholly conclusory allegation and not supported. These allegations cannot be construed as plus factors supplementing the plaintiff's conclusory allegations of an illegal agreement.

Further, there is an obvious alternative explanation to the alleged conspiratorial conduct — the defendants simply view works of certain artists, who are often represented by the Five Galleries, as worthy of collecting and showing. Indeed, the article the plaintiff cites to support his allegation of the prominence of artists represented by the Five Galleries states, "The over-representation of a particular gallery's roster can also be an unintentional consequence of shared tastes." Cavanaugh Decl. Ex. 1 at 2; see Amended Compl. ¶ 28. Conversely, to put it kindly, the defendants might not find the plaintiff's works worthy of collecting and showing. The plaintiff has not

provided facts illustrating that it was a conspiracy, not this perhaps more plausible explanation, that has kept his artwork out of the defendant museums. See Twombly, 550 U.S. at 566–67.

In conclusion, the plaintiff has not met his burden of alleging that the challenged conduct stems from an agreement among the defendants rather than from independent decisions of the defendants.

### D.

Finally, the defendants argue that the plaintiff has not alleged a per se violation of the Sherman Act and, under the rule of reason, has failed to allege a relevant geographic market or adverse effect on competition. The defendants contend that the plaintiff therefore has failed to plead a conspiracy in violation of the Sherman Act.

### 1.

The per se rule in antitrust cases is used "when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 103–04 (1984). Thus, the per se rule is appropriate only "in the relatively narrow circumstance where courts have sufficient experience with the [alleged wrongful] activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue." Hertz Corp. v.

City of New York, 1 F.3d 121, 129 (2d Cir. 1993). Conduct
constituting a per se violation of the Sherman Act must be so
manifestly anticompetitive that it would almost invariably tend
to restrict competition and decrease output. Id. at 130. For
example, horizontal agreements to set prices, which involve
coordination between competitors at the same level of a market
structure, are per se illegal. Apple, Inc., 791 F.3d at 313-14.
But vertical agreements, or agreements between parties at
different levels of a market structure, are not. Id.

When a court cannot determine that the alleged misconduct
is a per se violation of the antitrust laws, the "rule of
reason" governs the court's analysis. "The rule-of-reason
inquiry requires, at the motion to dismiss stage, that the
plaintiff identify the relevant market affected by the
challenged conduct and allege an actual adverse effect on
competition in the identified market." Watkins v. Smith, No.
12cv4635, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012),
aff'd, 561 F. App'x 46 (2d Cir. 2014).

The plaintiff has not alleged a per se antitrust violation.
The plaintiff makes one bare allegation in the amended complaint
that the alleged conspiracy is a per se violation of the Sherman
Act, Amended Compl. ¶ 72, but provides no further support.
Indeed, the defendants' moving brief argues that the plaintiff
failed to allege a per se violation, and the plaintiff's

opposition ignores the point. Moreover, the numerous deficiencies in the plaintiff's amended complaint, as identified above, prevent this case from being one of the relative few where the Court can determine that the alleged wrongful activity "is plainly anticompetitive and lacks any redeeming virtue." See Hertz Corp., 1 F.3d at 130. Finally, as pleaded, the alleged conspiracy appears to be based primarily upon vertical agreements between the defendants, who occupy one rung of the market structure, and the galleries, auction houses, and purchasers, who occupy another. Vertical agreements are not per se violations of the antitrust laws. Apple, Inc., 791 F.3d at 313-14. For these reasons, the plaintiff has not alleged a per se violation of the antitrust laws.

## 2.

Because the plaintiff has not alleged a per se violation, the rule of reason guides the Court's analysis. Under the rule of reason, the plaintiff has failed to identify the relevant market affected by the alleged conspiracy and failed to allege an actual adverse effect on competition in the relevant market.[3]

---

[3] The conclusion that the plaintiff has not pleaded a sufficient case under the rule of reason also supports the determination that the plaintiff has not alleged a per se violation of the antitrust laws. Generally, invoking the per se rule is appropriate only when "courts can predict with confidence that [the alleged misconduct] would be invalidated in all or almost all instances under the rule of reason." Leegin Creative Leather Prod., Inc. v. PSKS, Inc., 551 U.S. 877, 886-87 (2007).

**a.**

Although market definition is a fact-intensive inquiry not typically fit for dismissal at the pleadings stage, dismissal is proper where the plaintiff has not articulated "a plausible explanation as to why a market should be limited in a particular way." Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 53 (2d Cir. 2016). A plaintiff's claim should be dismissed if the plaintiff defines the market too narrowly – that is, where it is plain that reasonably interchangeable substitutes for the product or service at issue exist outside the proposed geographic market. See id. at 53-54 (dismissing the plaintiffs' complaint where the plaintiffs failed to claim persuasively that nearby gambling markets outside the plaintiffs' proposed market were not reasonably interchangeable substitutes for the casino-resort the plaintiffs were developing).

The plaintiff in this case contends that New York City is the relevant geographic market. In support, he claims that New York City has been ranked as the most prominent city for contemporary art and that a uniquely large amount of sales of the most expensive contemporary art take place in the city. Amended Compl. ¶¶ 46-47. Thus, according to the plaintiff, these allegations indicate that "New York City is the area in which 'consumers can turn, as a practical matter, for supply of the relevant product' because the most notable producers, dealers,

exhibitors, and purchasers of contemporary art are based in New York City."[4] Opp'n at 14 (quoting Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219, 227 (2d Cir. 2006), overruled on other grounds as recognized in Concord Assocs., 817 F.3d 46). Put another way, contemporary art in New York City is not interchangeable with contemporary art in other markets because the other markets are not as large as New York City and do not include as much prominent or highly valuable contemporary art.

The defendants insist that the plaintiff's description is insufficient to allege that New York City is the relevant geographic market because it depends upon the plaintiff's subjective assertions about the quality of contemporary art in the New York City market versus others. The defendants also contend that the plaintiff cites no facts supporting the assertion that contemporary artists are confined to selling and exhibiting their artwork in New York City. The defendants' arguments are persuasive.

Although the plaintiff alleges that the New York City market is large and that many high-value sales take place there, this does not mean that he cannot turn to other markets to sell and display his work. Indeed, the article the plaintiff cites

---

[4] However, the plaintiff's complaint does not allege harm to consumers. The Court thus construes this statement to mean that New York City is the area in which the plaintiff and other contemporary artists can look to, as a practical matter, to sell and exhibit their work because it is where the most notable dealers, exhibitors, and purchasers are based.

for the claim that New York City is especially influential also includes three other United States cities within its top fifteen most influential contemporary art cities. See Amended Compl. ¶ 47; Cavanaugh Decl. Ex. 3. These other cities offer hundreds of galleries, dozens of museums, and numerous art fairs. See Cavanaugh Decl. Ex. 3. Moreover, the plaintiff's complaint highlights that the Five Galleries, which allegedly represent the most prominent artists and offer the most valuable work, only account for nearly one-third "of solo museum exhibitions in the United States." Amended Compl. ¶ 28 (emphasis added). Indeed, the article the plaintiff cites for this fact incorporated sixty-eight museums throughout the United States into its methodology, including museums in Los Angeles, Houston, and Minneapolis. See Cavanaugh Decl. Ex. 1. And the plaintiff also states that his work has already been featured throughout the United States and Europe.

It is plain from the plaintiff's own allegations that robust contemporary art markets exist for his work outside of New York City. And the plaintiff has not persuasively explained why these others markets are not reasonably interchangeable substitutes for New York City. Cf. Concord Assocs., 817 F.3d at 53–54. Therefore, the plaintiff's proposed geographic market is too narrowly defined. See id. at 53.

**b.**

In addition, the plaintiff has not alleged an adverse effect on competition, the other requirement under the rule of reason. "A plaintiff may show an actual adverse effect on competition by showing increased prices, reduced quality, or reduced outputs." Abbott Labs., 2017 WL 5992355 at *6 (citing Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 264 (2d Cir. 2001)). Alternatively, the plaintiff may indirectly show an adverse effect "by pleading that a defendant had market power plus 'some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior.'" Id. (quoting Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 97 (2d Cir. 1998)). In pleading an adverse effect, the plaintiff must show that the challenged action had an effect on competition "as a whole in the relevant market"; proving harm to the plaintiff as an individual competitor is not enough. Tops Mkts., 142 F.3d at 96.

The plaintiff does not plead facts indicating how the alleged conspiracy affects New York City's contemporary art market as a whole. His allegation that the works of a select few artists have increased in price does not show an actual adverse effect on competition because the amended complaint contains no pleadings suggesting that this impacts the entire market – a

market which, as the plaintiff points out, includes more than
1,000 galleries, seventy-five museums, and thirty art fairs.
Amended Compl. ¶ 47. Moreover, the core of the plaintiff's claim
is that the works of artists other than the select few who
benefit from the conspiracy are artificially depressed in value.
The plaintiff also fails to show an adverse effect indirectly.
He does not plead facts delineating the scope of the defendants'
power in the crowded New York City contemporary art market, or
provide any other ground for believing that the alleged
conspiracy has harmed the market rather than harmed him as an
individual. Accordingly, the plaintiff has not alleged an
adverse effect on competition.

*          *          *

In sum, the plaintiff has not pleaded a per se violation of
the antitrust laws, and has also failed to state an antitrust
violation under the rule of reason. The plaintiff has therefore
failed to state a claim that the alleged conspiracy among the
defendants is in violation of the Sherman Act.

**IV.**

For the reasons that the plaintiff's claim under the
Sherman Act is dismissed, the plaintiff's claim under the
Donnelly Act must also be dismissed. See In re Interest Rate
Swaps Antitrust Litig., 261 F. Supp. 3d 430, 498 (S.D.N.Y. 2017)
("The Donnelly Act is patterned after the Sherman Anti-Trust Act

and is generally construed in light of federal precedent."
(quotation marks omitted)); Nat'l Gear & Piston, Inc. v. Cummins
Power Sys., LLC, 861 F. Supp. 2d 344, 370 (S.D.N.Y. 2012) ("The
standard for a well-pleaded Donnelly Act claim is the same as a
claim under Section 1 of the Sherman Act."); Int'l Television
Prods. Ltd. v. Twentieth Century-Fox Television Div. of
Twentieth Century-Fox Film Corp., 622 F. Supp. 1532, 1540 n.10
(S.D.N.Y. 1985) ("The standing and antitrust injury analyses
under the Donnelly Act mirror those under the Sherman Act.").
The Donnelly Act is generally coextensive with the Sherman Act
unless state policy, differing language, or legislative history
suggests otherwise. Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,
711 F.3d 68, 81 (2d Cir. 2013). In this case, no statutory
language, state policy, or legislative history requires a
different result under the Donnelly Act. Therefore, the
plaintiff's claim under the Donnelly Act is dismissed.

### V.

The plaintiff asks for leave to replead. The defendants
contend that the plaintiff should be denied this chance and his
amended complaint should be dismissed with prejudice because the
Court already allowed the plaintiff to amend his initial
complaint and because any amendment would be futile. Although
the plaintiff's amended complaint contains numerous
deficiencies, it is not plain that any amendment would be

futile. Moreover, the plaintiff's first amended complaint was
filed before the Court had a chance to address the merits of his
case. The plaintiff has not suggested how he will be able to
cure the numerous deficiencies in his complaint. Nevertheless,
because leave to amend should be freely given when justice so
requires, Fed. R. Civ. P. 15(a)(2), and the plaintiff has not
"repeated[ly] fail[ed] to cure deficiencies" to an extent
warranting dismissal with prejudice, see Foman v. Davis, 371
U.S. 178, 182 (1962), the plaintiff's amended complaint is
dismissed **without prejudice**.

**CONCLUSION**

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the arguments
are either moot or without merit. For the reasons explained
above, the defendant's motion to dismiss the plaintiff's amended
complaint is **granted**, and the plaintiff's amended complaint is
dismissed **without prejudice**. The plaintiff must file a motion to
amend, including a copy of the proposed second amended
complaint, by **January 15, 2019**, and the defendants may respond
by **February 5, 2019**. The plaintiff may reply by **February 15,
2019**.

The Clerk of Court is ordered to close Docket Number 31.

**SO ORDERED.**

Dated:      New York, New York
            December 19, 2018

                                    _____
                                          John G. Koeltl
                              **United States District Judge**